THOMPSON *v.* UNITED STATES (No. 1367).[1]

RESIDENTS RETURNING FROM ABROAD.

The appellant, though born in the United States, lived in England for many years with her father, who, at her birth and continuously thereafter, was a resident of England. She married in London a citizen of the United States. Voyaging to the United States after her marriage, she is not to be deemed a resident of the United States, returning thereto, but a person arriving in the United States, and under paragraph 642, tariff act of October 3, 1913, her personal effects were entitled to entry free of duty.

United States Court of Customs Appeals, June 1, 1914.

APPEAL from Board of United States General Appraisers, G. A. 7553 (T. D. 34354).

[Reversed.]

*James F. Curtis* for appellant.

*William L. Wemple*, Assistant Attorney General (*Charles E. McNabb*, assistant attorney, of counsel), for the United States.

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

DE VRIES, Judge, delivered the opinion of the court:

This appeal brings here for determination the question of the dutiability or exemption from duty of certain wearing apparel, articles of

---

[1] Reported in T. D. 34534 (26 Treas. Dec., 951).

personal adornment, and similar personal effects under the provisions of paragraph 642 of section 1 of the tariff act of October 3, 1913, which for more exact statement of the issue as well as reference may be quoted:

642. Wearing apparel, articles of personal adornment, toilet articles, and similar personal effects of persons arriving in the United States; but this exemption shall include only such articles as were actually owned by them and in their possession abroad at the time of or prior to their departure from a foreign country, and as are necessary and appropriate for the wear and use of such persons and are intended for such wear and use, and shall not be held to apply to merchandise or articles intended for other persons or for sale: *Provided,* That in case of residents of the United States returning from abroad all wearing apparel, personal and household effects taken by them out of the United States to foreign countries shall be admitted free of duty, without regard to their value, upon their identity being established under appropriate rules and regulations to be prescribed by the Secretary of the Treasury: *Provided further,* That up to but not exceeding $100 in value of articles acquired abroad by such residents of the United States for personal or household use or as souvenirs or curios, but not bought on commission or intended for sale, shall be admitted free of duty.

Mary Van Alen Thompson, the appellant and claimant, arrived at the port of Boston on the steamship *Arabic* October 16, 1913, from England, bringing with her divers articles concededly of the above enumerated classes. Duty was assessed thereupon by the collector of customs at Boston, whose decision was upon protest affirmed by the Board of General Appraisers, and claimant appeals to this court.

The evidentiary as distinguished from the probative facts are not seriously controverted. Mrs. Thompson is the daughter of James J. Van Alen. She was born in the United States at a time when her father was a resident of and maintaining his permanent home in England. He has continuously resided abroad ever since, and whenever he has entered this country has done so as a nonresident and been passed as such by the customs officials.

At the age of 6 months this daughter was taken abroad. Her visits to this country were infrequent, of short duration, and usually of the character and no different from the visits made by many residents of this country abroad. They may be enumerated briefly: During the years 1886 to 1896, which were years of her minority, she lived continuously abroad with her father and in school in Europe. She did not visit this country during that period of 10 years. In 1896 she made her debut in society in Newport, coming to this country for that purpose and remaining here but four months. She did practically the same in 1897. In 1898 and 1899 she did not visit this country. In 1900 she visited this country for a period of two or three months during the summer season at Newport. Since 1907 she has made but three visits to this country, to wit, 1909, 1910, and 1911, each of which lasted for but two months during the summer season. She was not in this country during 1912 or 1913 until her landing at Boston last October. So that it appears that during 28 years she had actually spent but 23 months in this country and that as a visitor, and, so far as

the record speaks, without any fixed or permanent abode, always returning after these short visits to England. During the several visits to this country she always declared for customs purposes as a nonresident and was so passed by the customs officials. In 1903 her father purchased Rushton Hall, a large estate in England, and from 1903 to 1906 this daughter lived with her father upon that estate, though not in Rushton Hall proper, which was undergoing improvements. In 1907 she and her father moved into Rushton Hall, where they have since lived, keeping the same as a permanent home, the daughter keeping house for the father, the mother having died some years previously. About 1907 Mr. Van Alen gave a house in New York City to the daughter. She never lived in this house, however, finally disposing of it by sale about 1912. On September 24, 1913, Miss Van Alen married Griswold A. Thompson. They were married in London. Mr. Thompson shortly thereafter, owing to the serious illness of his father in New York City, returned thereto, Mrs. Thompson remaining in England. Mr. Thompson is a citizen of the United States and a resident of New York City. Mrs. Thompson followed him to the United States later, but testified that when she came to this country she entertained a hope of returning to England to live at some future time, and in that view had left a great portion of her furniture, linen, and plate over there.

The Board of General Appraisers found as a fact in the case that up to the time of her marriage Mary Van Alen Thompson was a resident of England. We think this finding of the board is amply supported by the testimony. During her minority at least she was not only resident but domiciled in England, her residence and domicile following that of her father.

There is no question here that the articles in question were such as are necessary and appropriate and intended for the use and wear of a person of the standing and financial means of the appellant and were not intended for others or for sale.

The board predicated its decision entirely upon the proposition of the residence of the appellant, reasoning as stated in their opinion:

We reason from this rule that the protestant in this case ceased to be a resident of England in any event at the moment she began her return to the United States, and that at the same time she ceased to be a nonresident and became a resident of the United States, because having entered into the marital relation with a resident of the United States and begun her removal thereto, she by her own act constituted herself a resident of this country.

While there seems to be no decided case in this country fixing the exact time when the residential status of a married woman becomes that of her husband, treating the word "residence" as synonymous with "domicile," as we think we must in this case, the English as well as the French law seems to have been fairly well settled for many years. * * *

There may be serious question whether "residence" and "domicile" are always synonymous. While this may have been often so

held it is not always true, and the better rule of legal guidance would seem to give superior influence to the particular statute and its language, its history and reasons prompting its enactment. (Barney v. Oelrichs, 138 U. S., 529, 533.) Nevertheless, we are not prepared to hold, nor, in our view of the case, is it deemed essential to decide, that Miss Van Alen did or did not by her marriage to Mr. Thompson *ipso facto*, or by such acts done or intentions formed thereafter and before her arrival at the port of Boston, become costructively a resident of the United States.

The board having determined this issue against appellant decreed that conclusive of the case without deciding another and we think more serious and decisive issue presented.

A comprehensive view of the statute is persuasive almost to demonstration that Congress intended to and did effectively include within its purview *all* "persons" arriving in the United States and by its first proviso excepted from its purview only "residents of the United States *returning from abroad*," and by the second proviso "*such* residents," adverting to the limited class expressed, and expressed only in the next preceding or first proviso. We are, therefore, directly confronted with the inquiry as to what persons constitute "residents of the United States *returning from abroad*," and, is this appellant such, as that enumeration is employed by Congress? If not, there seems no escape from the deduction that she is within the broad generalization of all "persons" as that term is used in the purview of the statute.

Assuming for the purposes of decision without deciding that Mrs. Thompson by virtue of her marriage became constructively a resident of the United States, was she a "resident of the United States *returning from abroad?*" We think not. The word "returning," participle of "return," is defined by the leading lexicographic authorities as connoting a previous departure from and return to the place of commencement of the journey.

Webster defines "Return:"

To turn *back;* to go or come again to the same place or condition.

Worcester states:

Return: The act of returning; the act of going or coming *back.*

The Standard Dictionary likewise says:

Return: To cause to take again a former position; put, carry, or send *back*, as to a *former* place or holder.

The Century Dictionary and Cyclopedia defines "Return:"

1. To turn *back*. 2. To come *back;* come or go back to a *former place* or position; as, to *return home.*

The words "residents returning to the United States," therefore, lexicographically connote of necessity a journey in completion of a trip originally undertaken by departure from this country by residents thereof.

Mrs. Thompson, being a resident of England, had for many years departed therefrom and returned thereto. On such trips she was *a resident of England returning* thereto. When she became Mrs. Thompson, however, and be it assumed thereby a resident of the United States, and undertook this journey she was not a resident of the United States *returning thereto,* for she was not returning to the United States but undertaking another and a new journey to this country after having last returned *therefrom* to England some three years previously.

Counsel for both sides have ably exhausted the authorities legally defining the word "returning." The precedents apparently being so contradictory would seem to indicate hopeless conflict. Much of this apparent difference, however, can be reconciled by bearing in mind that in most cases a different statute or class of statutes was construed and the conclusion in the individual cases wrought out of the language of the precise act. So that while as precedents these decisions are of small guidance here as such, these opinions instruct that each such case must be determined upon the language of the statute under consideration. Accordingly, proceeding in respect to that sapient and salutory rule, this statute bears internal evidences of the congressional mind at enactment which leaves little or no question of the legislative intent—the one cardinal and controlling inquiry.

Did Congress in this act intend by the words "residents of the United States returning from abroad" to include journeys by residents originally undertaken from abroad to and not from the United States?

First. The word "returning" in the proviso is contrasted with the word "arriving" in the purview of the paragraph. All residents "returning" are likewise residents "arriving," and, if Congress had no purpose of distinguishing the two, the common, natural meaning of the former would have more adequately expressed the purpose than the more narrow, natural meaning of the latter. If we observe the spirit of the familiar rule that effect must be given to all the language of the act, we must ascribe this obvious and naturally different meaning to these different words confining the latter as indicated. See in Bradley Martin, jr., *v.* United States (1 Ct. Cust. Appls., 134; T. D. 31185), wherein this court pointed out the contrasted use of these words as indicative of their relative scope.

Second. The phrase is coupled in the legislative mind and by the statute related to "wearing apparel * * * *taken by them out of the United States* to foreign countries * * *." What words could more definitely demonstrate that when Congress spoke of residents returning it contemplated and intended its language to relate to those commencing a journey in the United States which journey would be completed by such "residents of the United States returning from abroad."

If the several constituent conditions expressed in this proviso must concur before it becomes operative, which would seem undebatable, then it could only operate in favor of or against those who were not only residents of the United States, but who commencing the journey here had "taken" such goods "by them out of the United States to foreign countries," and, further, who had in so doing complied with the Treasury regulations. Not only does *"taken by them* out of the United States" expressly limit and confine the application of this proviso to those residents actually commencing a journey in the United States, but it certainly also indicates that in this enactment Congress had in mind only those residents "returning" who had commenced the journey in this country. Taken by them. By whom? By a resident of the United States, *ex necessitate*, a resident not constructively such at the time the return journey was commenced, but actually such at the time the goods were taken from and the journey commenced in this country. Let us read further. This license is only granted upon compliance with the regulations promulgated by the Secretary of the Treasury and limited to residents of the United States. So that by the very terms and conditions of this proviso its application is limited to merchandise taken out of the country by one who is at the time of the taking a resident of the United States and *as such* can comply with the pertinent Treasury regulations. The whole framework and all the conditions of this proviso being expressly limited in its operation to residents of the United States who must be such at the time of the commencement of the journey, it seems that it can have, and was intended by Congress to have, no application to "persons arriving in the United States," including residents who are not returning but likewise arriving.

So the careful wording of the next proviso likewise argues. Congress cautiously confines its scope to "such residents," not only confirming the limitations of the first proviso, but emphasizing the amplitude of the purview of the paragraph.

The distinction between the case of a resident of the United States who as such a resident proceeds therefrom abroad continuing the while such a resident and returning to the United States at frequent intervals and a case such as this where the claimant was not returning to the United States but undertaking a journey thereto and who was not a resident of the United States, save, if at all, by legal construction, an effective factor in the consummation of which is the journey itself, is shown in Bache *v.* United States (4 Ct. Cust. Appls., 414, 415; T. D. 33852). Mrs. Bache was a resident of the United States at the origin of her journey. The trip commenced in this country and she was in fact returning thereto in completion of a trip earlier undertaken. The distinction between that case and this is

obvious and accords with the views of the Supreme Court of the United States construing the word "return" in a recent case.   The court said:

The indictment charges that the defendant did "unlawfully and knowingly return one Will Gordon and one Mose Ridley to a condition of peonage, by forcibly and against the will of them, the said Will Gordon and the said Mose Ridley, returning them, the said Will Gordon and the said Mose Ridley, to work to and for Samuel M. Clyatt."

Now a "return" *implies the prior existence of some state or condition*.   Webster defines it "to turn back; to go or come again to the same place or condition."   In the Standard Dictionary it is defined "to cause to take again a former position; put, carry, or send back, as to a former place or holder."   A technical meaning in the law is thus given in Black's Law Dictionary: "The act of a sheriff, constable, or other ministerial officer, in delivering back to the court a writ, notice, or other paper."

*It was essential, therefore, under the charge in this case to show that Gordon and Ridley had been in a condition of peonage, to which, by the act of the defendant, they were returned.* We are not at liberty to transform this indictment into one charging that the defendant held them in a condition or state of peonage, or that he arrested them with a view of placing them in such a condition or state.   The pleader has seen fit to charge a return to a condition of peonage.   The defendant had a right to rely upon that as the charge, and to either offer testimony to show that Gordon and Ridley had never been in a condition of peonage or to rest upon the Government's omission of proof of that fact. Clyatt *v*. United States (197 U. S., 207, 219).

It seems to us, therefore, that appellant is not a resident *returning* within the proviso, but a person arriving in the United States within the purview of the statute quoted and as such entitled to have her goods passed free of duty.

*Reversed.*